

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 8, 2015**

_____
**United States Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 09-38820-sgj-7** |
| **CENGIZ J. COMU,** | § | **(Chapter 7)** |
| | § | |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| **KING LOUIE MINING, LLC,** *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | **Adversary No. 10-03269-sgj** |
| | § | |
| **CENGIZ J. COMU a/k/a CJ COMU,** | § | |
| | § | |
| Defendant. | § | |

_____

| | |
|---|---|
| **DIANE G. REED, TRUSTEE,** | § |
| | § |
| Intervenor, Co-Plaintiff, and | § |
| Third-Party Plaintiff, | § |

1

|  |  |  |
|---|---|---|
| v. | § | **Adversary No. 10-03269-sgj** |
|  | § |  |
| **CENGIZ J. COMU,** | § |  |
|  | § |  |
| **Defendant.** | § |  |

### MEMORANDUM OPINION AND ORDER DETERMINING THAT PROPERTY AT 5301 PALADIUM DRIVE, DALLAS, TEXAS HAS BEEN ABANDONED AS DEBTOR'S AND NON-DEBTOR SPOUSE' S HOMESTEAD AND GRANTING REQUEST OF CHAPTER 7 TRUSTEE AND CERTAIN JUDGMENT CREDITORS FOR TURNOVER OF SUCH PROPERTY, IN AID OF COLLECTION OF MONEY JUDGMENT

**NOW BEFORE THIS COURT** is a request for relief that has been jointly sought by the

Chapter 7 Trustee and certain judgment creditors in a post-judgment context in the above-

referenced adversary proceeding (the "Adversary Proceeding"). The request pertains to an

allegedly abandoned Texas homestead.

Specifically, as explained more fully below, both the Chapter 7 Trustee and the

aforementioned judgment creditors have earlier (on July 8, 2014) obtained a postpetition money

judgment against Cengiz J. Comu, a/k/a CJ Comu (the "Debtor" or "Mr. Comu") and related

entities in this Adversary Proceeding after a five-day bench trial [DE ## 147 & 148] (hereinafter,

the "Adversary Judgment").[1] The Adversary Judgment was subsequently affirmed by the

District Court on July 24, 2015, and is now on appeal before the Fifth Circuit Court of Appeals,

although unstayed. The Chapter 7 Trustee and judgment creditors have recently become

embroiled in efforts to collect upon their Adversary Judgment. There is scarcely any ambiguity

as to what can and cannot be pursued, at this point, as far as collection efforts—since the

---

[1] As further explained herein, the aforementioned judgment creditors also have a ***prepetition*** money judgment against the Debtor issued by a New York state court.

Debtor's discharge was revoked as part of the Adversary Judgment (as further explained below). To that end, the Chapter 7 Trustee and judgment creditors have jointly filed an application for turnover relief and various injunctive relief [DE # 236] pursuant to Fed. R. Civ. Pro. 69, as incorporated into adversary proceedings pursuant to Fed. R. Bankr. Pro. 7069, seeking aid from this court in the collection of their Adversary Judgment (hereinafter, the "Post-Judgment Turnover Application").

Just one isolated portion of the multifarious relief sought in the Post-Judgment Turnover Application is now before the court: a request that the court ***determine that certain unencumbered property owned by the Debtor at 5301 Paladium Drive, Dallas, Texas (the "Paladium Property"), that the Debtor has previously exempted as a Texas homestead in his bankruptcy case, has been abandoned as a homestead and, thus, is subject to turnover in aid of collection of the Adversary Judgment***: The facts, distilled to their essence, are: (a) the Debtor and his non-debtor spouse resided at the unencumbered Paladium Property for several years before and on the bankruptcy petition date (the petition date was December 31, 2009) and claimed it as their homestead; (b) no one objected during the bankruptcy case to the homestead exemption asserted on the Paladium Property; (c) the Debtor and his spouse ***discontinued*** using the Paladium Property ***as a residence*** during the bankruptcy case—in fact, soon after the Chapter 7 Trustee's and judgment creditors' Adversary Proceeding was filed (in the fall of 2010)—and began renting it for income, directing the rental payments to be made to an entity that this court has earlier determined to be the alter ego of the Debtor; (d) the Debtor and his non-debtor spouse have continuously, for the past five years, while renting the Paladium Property, resided in another nearby Dallas home ("Home # 2"), that was purchased in the fall of 2010 for cash by a newly created foreign company that is allegedly owned and controlled by the Debtor's brother, a

3

resident of the country of Turkey (although the Debtor appears to have created and at all times directed the actions of such foreign entity, and the Debtor and his spouse have paid no rent for use of Home # 2 since 2011). To be clear, the issue before this court does not involve section 522 of the Bankruptcy Code and whether the Debtor claimed a valid homestead exemption on the Paladium Property at the outset of his bankruptcy case. The Chapter 7 Trustee and judgment creditors are not attempting to revisit that issue or make an argument similar to what was raised in the cases of *In re D'Avila*, 498 B.R. 150, 153 (Bankr. W.D. Tex. 2013) (J. Davis), *Cage v. Smith (In re Smith)*, 514 B.R. 838, 850 (Bankr. S. D. Tex. 2014) (J. Bohm), and *Lowe v. DeBerry (In re DeBerry)*, Adv. No. 15-05054, 2015 WL 6528024, at *1 (Bank. W.D. Tex. Oct. 28, 2015) (J. Gargotta), which addressed whether postpetition events in a Chapter 7 case, before closure of the case, can impact a debtor's previously claimed homestead exemption under section 522 of the Bankruptcy Code.[2] ***Rather, the Chapter 7 Trustee and judgment creditors are now in the posture of trying to collect upon a postpetition judgment issued by this court, in a context in which the Debtor has no discharge; they are simply seeking to reach any available nonexempt assets to collect upon their judgment.*** In this endeavor, they discovered circumstances that they believe demonstrate that the Debtor and his nondebtor spouse have abandoned what once was their homestead. If so, they seek a turnover of the property, pursuant to this court's authority under Fed. R. Bankr. Pro. 7069.

For the reasons set forth below, the court determines that the Debtor and non-debtor spouse have, indeed, abandoned the Paladium Property as a homestead, and the Chapter 7

---

[2] More specifically, these cases dealt with the application of the Texas Proceeds Rule to a claimed homestead exemption. *See* Tex. Prop. Ann. § 41.001(c) (West 2015).

4

Trustee and judgment creditors are entitled to and will be awarded turnover relief as to such property, as requested, in aid of collection on their Adversary Judgment. The court sets forth below its findings of fact and conclusions of law in support of this order.

## I. JURISDICTION

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) & (c) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core proceeding in which this court has statutory authority to issue final orders, pursuant to at least 28 U.S.C. §157(b)(2)(A), (E), and (O).

## II. FINDINGS OF FACT

### A. *The State Court Judgment and Commencement of Mr. Comu's Bankruptcy Case*

1. On April 30, 2009, in a case styled *Humitech Int'l Group, Inc., et al. v. Comu, et al.*, Index No. 06-602567 (New York 2009) (the "State Court Action"), three parties known as King Louie Mining, LLC, King Louie Enterprises, LLC and Ronald Katz (the "Katz Parties") recovered a prepetition judgment against Mr. Comu in the following amounts: $2,003,945.84 to King Louie Mining, LLC; $199,811.10 to King Louie Enterprises, LLC; and $75,508.22 to Ronald Katz; for a total amount of $2,279,265.16, plus post-judgment interest, until paid (the "State Court Judgment").

2. Soon thereafter, on December 31, 2009, Mr. Comu filed the above-referenced chapter 7 bankruptcy case (the "Bankruptcy Case"). His wife, Phyllis Comu ("Mrs. Comu"), did not file for bankruptcy relief. Diane Reed was appointed as the chapter 7 trustee (the "Chapter 7

Trustee" or the "Trustee").  The State Court Judgment represented 95% of the filed claims in Mr.

Comu's Bankruptcy Case.

3.       On January 15, 2010, Mr. Comu filed his bankruptcy schedules, which reflected

that he owned and claimed as his exempt homestead the Paladium Property.[3]  The Paladium

Property was valued at $379,370 and was unencumbered by any mortgage debt.  It was shown to

be community property, although Mr. Comu purchased the Paladium Property on March 30,

1999, at a time before he and Mrs. Comu were married (thus, it was legally presumed to be Mr.

Comu's separate property).[4]  In any event, the Comus began residing at the property soon after

its purchase,[5] and still lived there at the time Mr. Comu filed bankruptcy.  Mr. Comu has always

claimed the Paladium Property as his homestead for tax purposes[6] (although, interestingly, one

of Mr. Comu's affiliated entities that this court found to be his alter ego in the Adversary

Judgment, The Barclay Group, Inc. ("TBG"), actually paid the property taxes on the Paladium

Property—at least during certain years).[7]  No objections to Mr. Comu's claimed exemption on

---

[3] *See* DE # 11 in the Bankruptcy Case.  Note that references to "DE # __ in the Bankruptcy Case" throughout this Opinion refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in the above-referenced bankruptcy case.  Further note that references to "DE # __ in the AP" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in the Adversary Proceeding referenced above.

[4] *See* Tex. Fam. Code Ann. § 3.001 (West 2015).

[5] *See* Trustee Exhibit 1.

[6] *See* Transcript from hearing held 09/23/2015 regarding Post-Judgment Application [DE # 261 in the AP] (the "9/23/15 Transcript"), pg. 44.

[7] *See* DE # 147 in AP (Findings of Fact ## 349 & 395).  *See also* AP Trial-KLM Ex. 371 (pg. 1) and AP Trial-Trustee Ex. 24 (pg. 1).  Note that references throughout this Memorandum Opinion and Order to "AP Trial-KLM Ex. ___" and "AP Trial-Trustee Ex. ___" refer to exhibits admitted in the five-day trial in the Adversary Proceeding that resulted in the Adversary Judgment, of which evidence this court may take judicial notice in this post-judgment collection matter.  *See generally* Fed. R. Ev. 201.

the Paladium Property were lodged by the deadline set in the Bankruptcy Case, pursuant to

Bankruptcy Rule 4003(b). Thus, the homestead exemption on the Paladium Property was

deemed allowed in the Bankruptcy Case, for purposes of section 522 of the Bankruptcy Code.

4.      Mr. Comu received his discharge on April 14, 2010.  As explained further below,

Mr. Comu's discharge was later revoked during his Bankruptcy Case.

### B. The Incorporation of Continental Investments Holding Company Limited and Continental Partnership, Inc.

5.      Shortly before his discharge was initially entered (on March 18, 2010—perhaps

believing his fresh start was imminent), Mr. Comu incorporated a new entity known as

Continental Investments Holding Company Limited, a United Kingdom private limited company

("Continental Holding"), utilizing nominee services of an entity known as Mansion House

Capital ("Mansion House").[8]  An individual named Anne Boureau ("Boureau") was appointed as

Mr. Comu's nominee to serve as Continental Holding's sole director and shareholder.[9]

6.      At Mr. Comu's instruction, Boureau signed a letter dated April 19, 2010,

addressed to an individual named Cigdem Beykoylu at Turkish Bank in London, United

Kingdom ("Turkish Bank UK"), authorizing Cem Comu, Mr. Comu's brother who resides in

Istanbul, Turkey,[10] "to open and operate a Corporate Bank Account for the benefit and use of"

---

[8] *See* DE # 147 in AP (Findings of Fact # 338).  *See also* AP Trial-KLM Ex. 178 at pg. 4623 (March 18, 2010 email to Mr. Comu confirming incorporation of "your company" Continental Holdings); *id.* at pg. 4625 (certification of Continental Holdings' incorporation).  After receiving the incorporation information from Mansion House, Mr. Comu responded, "You the best!! Pls send invoice and Bank Wire Info.  Many thanks again-looking forward to the many deals in front of us!!"  AP Trial-KLM Ex. 211 at pg. 17647.

[9] *See* DE # 147 in AP (Findings of Fact # 338); *see also* AP Trial-KLM Ex. 178 at pg. 4623_2.

[10] *See* 9/23/15 Transcript, pg. 14.

Continental Holding (the "Continental Holding's Turkish Bank Account").[11]  Mr. Comu later

gave Boureau further information regarding a follow up phone conference he needed to schedule

between her and Turkish Bank UK so that they could confirm her authority with regard to the

Continental Holding's Turkish Bank Account.[12]

7.      Soon thereafter, in June of 2010, Mr. Comu enlisted the services of a company

known as Newhaven Limited ("Newhaven") to establish another new entity that ended up having

a similar name as Continental Holding, only it would be a British Virgin Islands entity:

Continental Partnership, Inc. ("Continental Partnership").  Newhaven was appointed as

registered agent for Continental Partnership and also agreed to "provide nominee director and

shareholder services" for it.[13]

8.      Mr. Comu has testified that Continental Partnership is owned and controlled by

his brother, Cem Comu.  However, Mr. Comu's testimony is not credible and is contradicted by

---

[11] *See* DE # 147 in AP (Findings of Fact # 338); AP Trial-KLM Ex. 214 at pgs. 18799-18800 (Mr. Comu forwarded a form letter to Boureau for her opening of a Continental Holding's Turkish Bank Account); AP Trial-KLM Ex. 180 at pgs. 6994-6995 (the form letter after having been signed by Boureau was returned to Mr. Comu via Mansion House, with the notation "Happy hunting"); AP Trial-KLM Ex. 215 at pgs. 18829-18830 (Mr. Comu next forwarded the Boureau-signed letter to his brother Cem to facilitate opening the Continental Holding's Turkish Bank Account).

[12] *See* DE # 147 in AP (Findings of Fact # 338); KLM Ex. 217 (May 22, 2010 email from Mr. Comu to Boureau, thanking her for her "assistance in opening a new Bank Account for Continental," and informing her that Turkish Bank UK needed "to confirm your instruction and grant the authorization").

[13] *See* DE # 147 in AP (Findings of Fact # 342).  On June 18, 2010, Newhaven informed Mr. Comu that "names beginning with Continental Group, Holdings Investment" (to mirror Mr. Comu's newly created UK entity, Continental Holdings) were unavailable, and proposed the name Continental Partnership Inc. as an alternative.  AP Trial-KLM Ex. 206 at pg. 15343.  Mr. Comu approved Continental Partnership as the corporate name and instructed Newhaven to register the entity.  AP Trial-KLM Ex. 206 at pg. 15343.  Newhaven incorporated Continental Partnership, at Mr. Comu's direction on June 18, 2010.  AP Trial-KLM Ex. 204 at pg. 14676 (certificate of incorporation); *id.* at pg. 14676_2–23 (Memorandum of Understanding and Articles of Incorporation for Continental Partnership).  Mr. Comu paid Newhaven £750 to set up Continental Partnership.  AP Trial-KLM Ex. 272; *see also* AP Trial-KLM Ex. 206 at pg. 15341.

documentary evidence.  For example, Mr. Comu's own correspondence confirms that Continental Partnership and its accounts were intended to be under Mr. Comu's, not Cem Comu's ownership and control: "[I]n the matter of Continental Partnership Inc. please note that this entity will be strictly under my ownership and control and therefore no further need from my brother .... As such I would like to activate some banking for this and transfer funds."[14]  Mr. Comu also personally controlled Continental Partnership's bank accounts(s), which Mr. Comu established for the express purpose of real estate and stock investments.[15]

9.      All existing evidence suggests that Mr. Comu's brother, Cem Comu, was only involved with Continental Partnership to the extent requested by Mr. Comu, as part of Mr. Comu's overall scheme to conceal his beneficial, *de facto* interest in it and its ultimate assets.[16]

---

[14] *See* DE # 147 in AP (Findings of Fact # 343).  *See also* AP Trial-KLM Ex. 202 at pg. 14152.

[15] *See* DE # 147 in AP (Findings of Fact # 343).  On August 16, 2010, a Newhaven representative forwarded to Mr. Comu certain due diligence documents that Newhaven required to set up a bank account for Continental Partnership at HSBC Bank and asked Mr. Comu to confirm the currencies to be held.  AP Trial-KLM Ex. 203 at pg. 14584 (with HSBC Bank's due diligence form attached).  Mr. Comu responded on August 17, 2010 that Continental Partnership's bank account would "primarily be USD," and inquired about getting copies of incorporation documentation so that he could operate the Continental Partnership's bank account personally.  AP Trial-KLM Ex. 204 at pg. 14675.  Mr. Comu inquired whether he could conduct Continental Partnership's banking individually, "or must everything go through" Newhaven like [another entity he had named WPA].  AP Trial-KLM Ex. 202 at pg. 14152.  Reuben Anstock confirmed that Mr. Comu "will have to run everything through us [*i.e.*, Newhaven] as per WPA," and referred Mr. Comu's banking question to "CJ" (*i.e.*, Charlotte Jacob of Newhaven).  AP Trial-KLM Ex. 202 at pgs. 14151-14152.  On August 24, 2010, Newhaven informed Mr. Comu that it was "not possible for [Newhaven] to grant control over the bank account unless we are the nominees of the company," and that if Mr. Comu only needed the entity, and not a bank account, Newhaven "will need to resign as nominees."  AP Trial-KLM Ex. 206 at pg. 15341.  AP Trial-KLM Ex. 275 at pg. 50764 ("In regards to CPI [*i.e.*, Continental Partnership] – I would like to open & operate a Bank Acct and look to make investments of Real Estate and/or Stocks.  As such could you please provide me the necessary docs and or resolutions that would allow me to have such authority?").

[16] In June of 2010, per Mr. Comu's instructions, Newhaven asked Cem Comu to execute the necessary documents by which Newhaven resigned as Continental Partnership's sole director, and transferred one (1) share of Continental Partnership to Cem Comu so he could vote as Continental Partnership's director.  AP Trial-KLM Ex. 266 at pgs. 43349–43350 ("CJ has asked me to contact you direct, regarding the above."); AP Trial-KLM Ex. 267 at pgs. 43444, 43445.  On September 16, 2010, per Mr. Comu's instructions, Newhaven forwarded the necessary documents for Cem Comu to temporarily assume the role of Director for Continental Partnership, which Cem Comu signed and returned.  AP Trial-KLM Ex. 210 at pgs. 16771, 16774-16775.  Cem Comu was appointed as a Continental Partnership director at Mr. Comu's request, and after transferring its Continental Partnership share to

### C. *Commencement of the Section 727 Adversary Proceeding and the Purchase of the Oaks North Property ("Home # 2")*

10.      A little more than eight months after the Bankruptcy Case was filed, on September 3, 2010, the Katz Parties commenced the Adversary Proceeding against Mr. Comu seeking to revoke Mr. Comu's earlier-granted discharge, pursuant to section 727(d) of the Bankruptcy Code, primarily arguing that Mr. Comu had concealed certain assets, income, and failed to disclose various business transactions as required in his Bankruptcy Case, and the Katz Parties did not know of such fraud, until after the granting of the discharge.[17]  On September 6, 2012, the Trustee filed her own intervening complaint within the Adversary Proceeding which: (1) sought a declaratory judgment regarding Mr. Comu's various property interests in certain business entities; (2) asserted reverse veil piercing claims to determine that certain business entities were the alter egos of Mr. Comu; and (3) requested turnover of these various property interests to the bankruptcy estate.[18]

11.      Approximately two weeks after the  Adversary Proceeding was commenced, on September 18, 2010, Continental Partnership entered into a Real Estate Contract to acquire a residence at 14873 Oaks North Place, Dallas, Texas 75254 ("Home # 2") for $397,000 in cash.[19] Then a month later, on October 18, 2010, Continental Partnership actually acquired Home # 2, pursuant to a General Warranty Deed (Cash), recorded on October 21, 2010.[20]

---

Cem Comu, Newhaven resigned as Continental Partnership director on September 29, 2010.  AP Trial-KLM Ex. 132.

[17] *See* DE # 20 in the AP.

[18] *See* DE # 53 in the AP.

[19] AP Trial—KLM Ex. 130.

[20] *See* Trustee Exhibit 3.

12.     The totality of the credible evidence demonstrates clearly and conclusively—in fact, beyond any shadow of a doubt—that the purchase of Home # 2 by Continental Partners was a sham transaction, designed to confiscate and hide Mr. Comu's beneficial and *de facto* interest in Home # 2.

13.     Besides the evidence that it was Mr. Comu (not his brother) who directed the creation and actions of Continental Holding and Continental Partnership just before the purchase by Continental Partnership of Home # 2, the totality of the evidence is as follows.  First, the Real Estate Contract provided that notices on behalf of the buyer should be sent to Mr. Comu.[21] Additionally, at the buyer signature line, there was a mere stamp signature for "Continental Partnership, Inc., Cem Comu, President."[22]  Additionally, it appears that Mr. Comu was involved in negotiating and consummating the transaction.[23]  Also, the home warranty for Home # 2 ultimately identified Mr. Comu as the "home buyer," and was involved with making claims under it.[24]

14.     Home # 2 is approximately 3,000 square feet with three bedrooms and three bathrooms.[25]  It is also only a block away from the Paladium Property.[26]

---

[21] *Id.* at pg. 000245.

[22] *Id.* at pg. 000246.

[23] On September 15, 2010, Mr. Comu approved the $397,000 cash offer for the Oaks North Residence. KLM Ex. 279 ("Great Job on the House Negotiation.  Lets proceed – with the offer of $397,000.").

[24] AP Trial-KLM Ex. 133 at pgs. 000181, 000184, 000188, 000191; AP Trial-KLM Ex. 131 at pgs. 000052–000053.

[25] *See* 9/23/15 Transcript, pg. 12.

[26] *See* Transcript for Hearing Held 10/19/2015, DE # 266 in the AP (the "10/19/15 Transcript"), pg. 75.

15.     When Mr. Comu was asked by the Trustee if he had any personal involvement with Continental Partnership's purchase of Home # 2, Mr. Comu testified in a less-than-candid fashion, as follows:

> Q.     Mr. Comu, did you have any involvement in the purchase of the Oaks North residence by CPI?
> A.     Could you define involvement, because I did tell my brother that there was a house in Dallas that I thought he should look at.
> Q.     When I say involvement, I mean did you have discussions with the seller concerning the purchase of the Oaks North property by CPI?
> A.     There was a real estate agent involved that represented my brother. I may have had a conversation or something. I don't recall. I am sorry.[27]

16.     When Mr. Comu was additionally asked by the Trustee if his brother actually ever came to Dallas to look at Home # 2, Mr. Comu testified that he did, but when further asked if Mr. Comu went to look at the property with his brother, he testified, "I may have.  I am not a hundred percent certain."[28]  This testimony was evasive and not believable.  Not only is Home # 2 a block away from the Paladium Home, but the documentary evidence reflects that Mr. Comu was in all meaningful ways handling the purchase of Home # 2.[29]

17.     In any event, shortly after Home # 2 was purchased, Mr. and Mrs. Comu moved out of the Paladium Property and into Home # 2.  Mr. Comu testified that they vacated the Paladium Property so he could generate some rental income from it and hopefully improve his current financial circumstances, and his brother wanted to help Mr. Comu in his time of financial distress.[30]

---

[27] *See* 9/23/15 Transcript, pg. 13.

[28] *Id.* at pg. 25.

[29] *See* footnotes 20-24, *supra*.

[30] *See* 9/23/15 Transcript, pg. 16.

12

18.     Regarding Home # 2, Mr. and Mrs. Comu purportedly entered into a five-year lease agreement with landlord Continental Partnership (the British Virgin Islands entity that Mr. Comu had formed just a few months earlier), which lease commenced November 1, 2010 and was to expire November 1, 2015 (the "Home # 2 Lease").[31] The Home # 2 Lease appears to have been signed by someone on behalf of Continental Partnership, but the signature is not legible.  In any event, the address shown for Continental Partnership for sending rental payments (among other things) is an address in Istanbul, Turkey.  After the initial five-year term of the Home # 2 Lease expired, the Home # 2 Lease would be month-to-month, unless either Continental Partnership or Mr. Comu provided the other party written notice of termination not less than 30 days before the expiration date.[32] At the time of the hearing on this matter, Mr. and Mrs. Comu still lived in Home # 2 (*now more than five years*) and there was no evidence presented that Continental Partnership has chosen to terminate the Home # 2 Lease or that Mr. Comu has had any discussions with his brother about extending the Home # 2 Lease beyond its five-year term.[33]

19.     The Home # 2 Lease requires Mr. Comu to pay $1,500 per month for rent to Continental Partnership.[34] *However, Mr. Comu stopped making monthly rent payments under*

---

[31] *See* Trustee Exhibit 4.

[32] *Id.* at ¶ 3.

[33] *See* 9/23/15 Transcript, pg. 26.

[34] *See* Trustee Exhibit 4.

*the Home # 2 Lease just a few months after entering into it—in late 2011.[35] Thus, Mr. and*

*Mrs. Comu have lived at Home # 2 "rent-free" for several years now*.

20.     Since moving into Home # 2, Mr. Comu and his wife have initiated some

remodeling and minor handyman work at the property, but both were somewhat evasive in their

testimony as to what—admitting to having some outdoor spotlights installed and having the attic

renovated into a closet—all of which (according to Mr. Comu's testimony) totaled around

$5,000.[36]

### D.     The Leasing of the Paladium Property

21.     After moving out of the Paladium Property, Mr. Comu began leasing the

Paladium Property to two individuals named Dan and Kim Lonergan.[37]

22.     After the lease with the Lonergans was terminated or expired, Mr. Comu then

leased the Paladium Property to Mervyn Price ("Mr. Price") and his wife Marianne ("Mrs. Price"

and, collectively with Mr. Price, the "Prices").  Mr. Price is the Chief Executive Officer of Regus

Advisors, one of several companies owned and chaired by Mr. Comu.  Mr. Price was hired by

Mr. Comu in mid-2011.[38]  Mr. Price and his wife executed a five-year lease agreement with Mr.

Comu as landlord,[39] commencing August 1, 2012 and expiring August 1, 2017 (the "Paladium

---

[35] *See* 9/23/15 Transcript, pgs. 26-27.

[36] *Id.* at pgs. 16 & 41-42; 10/19/15 Transcript, pgs. 41-43 & 80.

[37] *See* 9/23/15 Transcript, pg. 17.

[38] *Id.* at pgs. 16 & 37.

[39] Mr. Price testified that he, not Mr. Comu, specifically requested that the lease be for five years.  *Id.* at pg. 55.

Property Lease").[40]  While the Paladium Property Lease was for a five-year term, there was an oral agreement between Mr. Comu and Mr. Price that if the Prices wanted to vacate the Paladium Property prior to the end of the five-year lease term, that Mr. Comu would not object.[41]

23.    The rent associated with the Paladium Property Lease was $2,500 per month to be paid—not to the Comus, who own the Paladium Property—but to Sunset Pacific.[42]  Sunset Pacific was an entity that this court held, as part of the Adversary Judgment, to be the alter ego of Mr. Comu.[43]  In any event, the evidence reflected that the rent paid by the Prices on the Paladium Property actually went directly to Mrs. Comu and was deposited into her personal bank account, despite the wording of the Paladium Property Lease.[44]

24.    The Paladium Property Lease provided that Mr. Comu was required to pay for the real estate taxes, homeowner dues, and maintenance on the Paladium Property, including the repair and maintenance of the heating and air conditioning systems.[45]  While Mr. Comu did pay for some routine maintenance associated with the Paladium Property including fence repair, pool cleaning, and lawn care, Mr. Price on one occasion replaced the air conditioning system at his own personal cost of approximately $13,800, because Mr. Comu was allegedly short on money at the time the repair was needed.[46]

---

[40] *See* Trustee Exhibit 2.

[41] *See* 9/23/15 Transcript, pgs. 19-20.

[42] *See* Trustee Exhibit 2.

[43] *See* DE # 147 in AP (Findings of Fact # 397).

[44] *See* 9/23/15 Transcript, pg. 21.

[45] *See* Trustee Exhibit 2 ¶¶ 11, 17 & 18; 9/23/15 Transcript, pgs. 22 & 46.

[46] *Id.* at 22 & 57.

### E. The Adversary Proceeding Judgment

25.    As earlier mentioned, it was in March 2014, that this court held a five-day trial in the Adversary Proceeding, and on July 8, 2014, ultimately entered the Adversary Judgment.[47]  In terms of actual dollars, the Katz Parties recovered a monetary judgment in the amount of $992,555.30, and the Trustee recovered a monetary judgment in the amount of $5,858,778.[48]

### F. Mr. Comu's Attempts To Obtain a Home Equity Loan on the Paladium Property

26.    In August and September of 2014 (soon after the Adversary Judgment was entered), Mr. Comu made ultimately unsuccessful attempts to obtain a home equity loan on the Paladium Property.[49]  On September 16, 2014, Mr. Comu sent an email to Mr. Price informing him that he was working on obtaining a home equity loan on the Paladium Property and needed access to the home so he could get an appraisal completed.[50]  Mr. Price responded that he was also thinking about getting an appraisal performed on the Paladium Property, so he could make an offer to Mr. Comu to purchase the Paladium Property.[51]  This was not the first time that Mr. Price had communicated to Mr. Comu that he was interested in purchasing the Paladium Property.  Specifically, Mr. Price testified:

> Q.    So on September 16, Mr. Comu is contacting you, because he is in the process of obtaining an appraisal for a home equity loan, correct?
> A.    Correct.

---

[47] See DE ## 148 & 219 in the AP.

[48] Id.

[49] See 9/23/15 Transcript, pgs. 28-29 & Trustee Exhibits 10-11 & 13-14.

[50] See Trustee Exhibit 11.

[51] Id.

Q.      And your response to him was that you were considering making an offer to purchase the Paladium yourself; is that right?

A.      Correct.

Q.      Is this the first time you informed Mr. Comu your interest in purchasing the Paladium?

A.      No.

Q.      So you had earlier discussions with him about your interest in purchasing this property?

A.      Yes.

Q.      In those discussions, what did Mr. Comu say to you, as it relates to whether or not the Paladium was available for sale?

A.      He told me it was available for sale.

Q.      It was?

A.      It was, yes.[52]

This is rather inconsistent with Mr. Comu's testimony.  Specifically, Mr. Comu testified that while Mr. Price expressed interest in buying the Paladium Property, Mr. Comu had repeatedly told Mr. Price that he was not interested in selling the property.[53]  However, the court does not find Mr. Comu's testimony credible.  Mr. Price was more credible when he testified that starting in August or September 2014, he began having discussions with Mr. Comu about purchasing the Paladium Property.  He said that Mr. Comu told him it was "available for sale."[54]  Mr. Price testified that he had "maybe eight, possibly ten" discussions with Mr. Comu from September 2014 up until the day before the hearing on this matter.  To further clarify, Mr. Price stated that he offered to purchase and Mr. Comu offered to sell the Paladium Property earlier.  They had simply not agreed upon a price, and Mr. Price was not in a position to make the acquisition until

---

[52] *See* 9/23/15 Transcript, pg. 60.

[53] *Id.* at pgs. 38-40.

[54] *Id.* at 60.

17

late 2015 when he closed on the sale of another property that Mr. Price owned on Holland Avenue.[55]

27.      Returning to the topic of Mr. Comu's efforts to obtain a home equity loan on the Paladium Property in mid-2014, in correspondence in October 2014 with an individual named Leann Ly ("Ms. Ly"), one of the home loan specialists with whom Mr. Comu was working, Ms. Ly asked Mr. Comu about several judgment liens against the Paladium Property that had been discovered by a title company.  These apparently were relating to the prepetition judgments that the Katz Parties and possibly others had obtained before the Bankruptcy Case.  Ms. Ly indicated that, if the judgments were valid, she would be unable to proceed with a home equity loan on the Paladium Property.[56]  Mr. Comu responded to Ms. Ly with the following:

> Dear LeeAnne-
> Please see attached Credit Report of August 23, 2014.  The Judgment you referenced are dated June 23, 2009.  As you are aware, I filed a Chapter 7 on December 31, 2009.  I received a discharge on April 4, 2010 (attached). If you look at page FOUR of my Credit Report-it shows the Judgements are PAID.  Please Update your files and advise accordingly.[57]

As noted above, this email was many months after Mr. Comu's discharge had been **_revoked_** by the bankruptcy court and the Adversary Judgment had been entered.  In other words, Mr. Comu was not candid with Ms. Ly.  When asked about this at the hearing on this matter, Mr. Comu testified rather vaguely and incredulously, stating that he didn't "recall" if he informed Ms. Ly

---

[55] *Id.* at 68-70.

[56] *See* Trustee Exhibit 14.

[57] *Id.*

18

that his discharge had, in fact been revoked, and that he did not know whether the credit report he sent to her was accurate or inaccurate.[58]

28.     Several months later on March 27, 2015, Mr. Comu sent Mr. Price a copy of the appraisal he had obtained on the Paladium Property, which appraised the Paladium Property at $395,000.[59] Mr. Price credibly testified that he believed that Mr. Comu sent the appraisal in order to communicate his asking price on the house, indicating that this was the price to purchase the Paladium Property.[60] This seems plausible to the court, since this was several months after Mr. Comu's unsuccessful attempt to obtain a home equity loan on the Paladium Property. In any event, Mr. Price did not make an offer to purchase the Paladium Property at this point—mainly because he was not in a position financially to do so, as he was still in the process of selling another property he owned on Holland Avenue.[61] Moreover, Mr. Price also still desired to obtain an independent appraisal to validate Mr. Comu's, because there were significant problems with the Paladium Property that Mr. Price believed were not incorporated into Mr. Comu's appraisal.[62]

---

[58] *See* 9/23/15 Transcript, pgs. 30-31.

[59] *See* Trustee Exhibit 13.

[60] *See* 9/23/15 Transcript, pg. 64.

[61] *Id.*

[62] *Id.* The court would also note that there appears to have been a conversation between ***Mrs. Comu and Mrs. Price*** regarding the Comus' desire to sell the Paladium Property to the Prices at around the very same time that Mr. Comu sent Mr. Price the appraisal (end of March 2015). Specifically, Mrs. Comu and Mrs. Price spoke at a social gathering and Mrs. Comu asked if Mrs. Price was still interested in purchasing the Paladium Property. Mrs. Price credibly testified that she believed that she and her husband were no longer interested in purchasing the Paladium Property and decided to avoid responding to Mrs. Comu's question. *See* 10/19/15 Transcript, pgs. 8-10.

29.     According to Mr. Price's testimony, which seemed wholly credible, Mr. Comu always indicated a desire to sell the Paladium Property to Mr. Price[63] until, suddenly, the day before this court was scheduled to conduct a hearing on this matter of whether the homestead had been abandoned by the Comus.  Specifically, Mr. Price testified as follows:

> Q.     Has Mr. Comu ever indicated to you that he had no interest in selling the house to you because he intended to move back into Paladium?
> A.     No, ***not until probably yesterday when he came into my office and made that statement***.
> Q.     Tell me about what he said.
> A.     He said it was his homestead, and he intends to move back in when we move out. We will come to an agreement when we move out, something to that effect. I don't recall it exactly, but it was different to other conversations, and it occurred yesterday.
> Q.     And that's the first time you recall him ever saying that?
> A.     Yes.[64]

Upon learning that Mr. Comu was no longer willing to sell him the Paladium Property, the Prices have started looking for another home.[65]

## III.   CONCLUSIONS OF LAW

As stated above, the issue before this court does not involve section 522 of the Bankruptcy Code, or whether Mr. Comu had a valid homestead exemption on the Paladium Property at the outset of his bankruptcy case, or whether postpetition events in a Chapter 7 case, before closure of the case, can impact a debtor's previously claimed homestead exemption under

---

[63] There was even evidence during the hearing on this matter indicating that Mr. Comu and Mr. Price had once emailed about the possibility of Mr. Comu ***gifting*** the Paladium Property to Mr. Price as compensation, if a certain business transaction they were working on was successful. *See* 9/23/15 Transcript, pg. 34.

[64] *See* 9/23/15 Transcript, pgs. 67-68 (emphasis added).

[65] *Id.* at 69.

section 522 of the Bankruptcy Code.[66]  Rather, the Trustee and the Katz Parties are now

attempting to collect upon the Adversary Judgement, in a context in which Mr. Comu has no

discharge, and are specifically looking to any and all of Mr. Comu's non-exempt assets to do so.

The Trustee and Katz Parties believe that at this point in time, the Paladium Property is no longer

exempt.  They believe it has been abandoned as a homestead by the Comus.  However, the

Comus have argued that the Paladium Property is still their exempt homestead under Texas law

and as such, the Trustee and the Katz Parties may not look to it to satisfy the Adversary

Judgment.

### A.  Claiming a Homestead Under Texas Law

It is well accepted that Texas law provides extremely broad protection for homesteads.  A

homestead is a legal interest created through the Texas Constitution and the Texas Property Code

that provides prophylactic protection from seizure and encumbrances thereon in all but a narrow

range of circumstances (including debts incurred to purchase the homestead, taxes, and debts

owed for work or services performed on the homestead).[67]  Texas law limits homesteads in size,

but not in value.[68]  Homestead rights protect individuals from losing their homes, and statutes

relating to homestead rights are to be liberally construed.[69]

---

[66] *See generally In re D'Avila*, 498 B.R. 150, 153 (Bankr. W.D. Tex. 2013) (J. Davis), *Cage v. Smith (In re Smith)*, 514 B.R. 838, 850 (Bankr. S. D. Tex. 2014) (J. Bohm), and *Lowe v. DeBerry (In re DeBerry)*, Adv. No. 15-05054, 2015 WL 6528024, at *1 (Bank. W.D. Tex. Oct. 28, 2015) (J. Gargotta).

[67] *See* Tex. Const. art. XVI § 50; Tex. Property Code Ann. § 41.001 (West. 2015); *Heggen v. Pemelton*, 836 S.W.2d 145, 148 (Tex. 1992).

[68] Tex. Prop. Code Ann. § 41.001, .002 (West 2015).

[69] *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 634-35 (Tex. 1987).

Here, the Comus have claimed the Paladium Property as their exempt homestead and, as the claimants, the Comus have the initial burden to establish the character of the Paladium Property as their homestead[70] by showing a combination of both (1) overt acts of homestead usage and (2) an intention to claim the Paladium Property as their homestead.[71]  "[M]ere ownership or possessory interest is not of itself sufficient to establish a homestead."[72]

The initial burden to establish the homestead character of property under Texas law is typically a low hurdle and, in the usual case, mere evidence of "overt acts of homestead usage" in the form of possession and usage of the property as a homestead is sufficient.[73]  Thus, when the claimant actually resides at the property, a court generally does not need to investigate the second prong of "intention to claim as a homestead" because actually residing on the property is "the most satisfactory and convincing evidence of intention."[74]  Here, however, the Comus no longer reside at the Paladium Property, but rather have been living at Home # 2 for the last five years.  This fact, however, does not necessarily prevent the Comus from claiming the Paladium Property as their homestead.  Specifically, Texas law provides that the fact that the Comus no

---

[70] The court reiterates once again that this current dispute does not involve section 522 of the Bankruptcy Code, or whether Mr. Comu had a valid homestead exemption on the Paladium Property at the outset of his bankruptcy case—where Bankruptcy Rule 4003(c) would govern and provides that "the objecting party has the burden of proving that the exemptions are not properly claimed."

[71] *Bradley v. Pac. S.W. Bank, FSB (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992), *cert. denied*, *Commonwealth Land Title Ins. Co. v. Bradley*, 507 U.S. 971 (1993) (citing *Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.)).

[72] *In re Mitchell*, 132 B.R. 553, 558 (Bankr. W.D. Tex. 1991) (citing *Greenawalt v. Cunningham*, 107 S.W.2d 1099 (Tex. Civ. App. 1937)).

[73] *Bradley*, 960 F.2d at 507.

[74] *PaineWebber Inc. v. Murray*, 260 B.R. 815, 822-823 (E.D. Tex. 2001) (citing *Youngblood v. Youngblood*, 76 S.W.2d 759, 760-61 (1934)).

longer reside at the Paladium Property does not preclude a finding of entitlement to claim that property as a homestead, provided that the evidence shows that the Paladium Property was: (1) previously the Comus' homestead, ***and*** (2) that they have not since ***abandoned it***.[75] As to the first prong, the facts demonstrate that the Comus resided at and established a home on the Paladium Property at least until the fall of 2010, after which time they moved out of the Paladium Property and began occupying Home # 2, which Mr. Comu purchased through Continental Partnership.[76] Thus, since the Comus no longer live at the Paladium Property, the issue of whether the Comus have abandoned their homestead interest in the Paladium Property becomes critical to this court's analysis.

### B. Abandoning a Homestead Under Texas Law

Under Texas law, property that has been designated as homestead will not lose that character unless abandonment, death, or alienation occurs.[77] The Trustee, as the party claiming abandonment, has the burden of proving that the Comus abandoned their homestead interest in the Paladium Property.[78] What constitutes abandonment? In order to establish abandonment, there must be "both the cessation or discontinuance of use of the property as a homestead,

---

[75] *In re Schott*, 449 B.R. 697, 703 (Bankr. W.D. Tex. 2011) (citing *In re Leonard*, 194 B.R. 807, 809-10 (Bankr. N.D. Tex. 1996)) (emphasis added).

[76] Moreover, the court notes that a claimant's homestead designation is also considered *prima facie* evidence of what constitutes a family homestead. *See Perry v. Dearing (In re Perry)*, 345 F.3d 303, 311 (5th Cir. 2003).

[77] *Thaw v. Schachar (In re Thaw)*, No. 15-40321, 2015 WL 5718970, at *5 (5th Cir. Sept. 30, 2015) (unpublished) (citing *Duran v. Henderson*, 71 S.W.3d 833, 842 (Tex. App.—Texarkana 2002, pet. denied)); *see also Majeski v. Estate of Majeski*, 163 S.W.3d 102, 107 (Tex. App.—Austin 2005, pet. denied); *Wilcox v. Marriott*, 103 S.W.3d 469, 472 (Tex. App.—San Antonio 2003, pet. denied) (citing *Garrard v. Henderson*, 209 S.W.2d 225, 229 (Tex. Civ. App.—Dallas 1948, no writ)).

[78] *Sullivan v. Barnett*, 471 S.W.2d 39, 43 (Tex. 1971).

coupled with the intent to permanently abandon the homestead."[79]  While simply changing

residence to a new home and temporarily renting out the old home does not necessarily equate to

abandonment, where it is clear that there has been a discontinuance of use of the old home

coupled with an intention not to return and use it as a homestead, abandonment has occurred.[80]

Moreover, the evidence establishing the abandonment of a homestead "must be undeniably

clear" and must be "beyond almost the shadow, at least [of] all reasonable ground of dispute, that

there has been a total abandonment with an intention not to return and claim the exemption."[81]

Several courts have held that the best evidence of an abandonment of a residential

homestead is ***that a new and permanent home has been acquired and occupied***.[82]  In fact, the

establishment of one homestead and the abandonment of another have been held to be linked

concepts.[83]  Specifically, when confronted with the issue of abandonment, courts in Texas often

analyze the facts to determine whether a new homestead has been established and then conclude

---

[79] *Estate of Montague v. Nat'l Loan Investors, L.P.*, 70 S.W.3d 242, 248 (Tex. App.—San Antonio 2001 pet. denied) (citing *Womack v. Redden*, 846 S.W.2d 5, 7 (Tex. Civ. App.—Texarkana 1992, writ denied) (per curiam)); *see also Hudgins v. Thompson*, 211 S.W. 586, 587-88 (Tex. 1919).

[80] *Thomas v. Graham Mortg. Corp.*, 408 S.W. 3d 581, 589 (Tex. App.—Austin 2013) (citing *Rancho Oil Co. v. Powell*, 142 Tex. 63, 68-69 (1943)); *see also* Tex. Prop. Code Ann. § 41.003 (West 2015) ("Temporary renting of a homestead does not change its homestead character if the homestead claimant has not acquired another homestead.")).

[81] *Burkhardt v. Lieberman*, 159 S.W.2d 847, 852 (Tex. 1942) (quoting *Gouhenant v. Cockrell*, 20 Tex. 96, 98 (Tex. 1857)).

[82] *Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996) (citing *Panhandle Const. Co. v. Wiseman*, 110 S.W.2d 615, 617 (Tex. Civ. App.—Amarillo 1937, writ dism'd)).  By way of example, this could include the acquisition of another home, removal of the family from one dwelling to another, its occupancy and use as a homestead, and an absence of acts evidencing an intention to return to the former home.  *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 809 (Tex. App.—Austin, 2004, pet. denied) (citing *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733, 736 (Tex. Civ. App.—Dallas 1934, writ ref'd)).

[83] *See Silvers v. Welch*, 91 S.W.2d 686, 687–88 (1936).

24

that the old homestead has been abandoned as a legal result.[84]  Thus, if the Trustee can ultimately show the establishment of a new **homestead** by the Comus (*i.e.*, a combination of both overt acts of homestead usage and the intention on the part of the Comus to claim Home # 2 as their homestead), abandonment of the Paladium Property would be the legal result.  The court believes that a discussion of the case *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733 (Tex. Civ. App.—1934, writ ref'd) best illustrates the concept discussed above.

In *Hinton*, Uvalde Paving Company had sued Mrs. Eva Hinton (joining pro forma with W.R. Hinton, her present husband), who was administratrix of the estate of her late husband, D. H. Mitchell, to recover the balance due on two street paving certificates and to establish liens on certain property on Catherine Street.[85]  In response, Mrs. Hinton had argued that the property on Catherine Street was her and her former husband's protected homestead.[86]  At the trial court level, the district court had only submitted the issue of attorney's fees to the jury, finding that the undisputed evidence established that the paving certificates created valid liens upon the Catherine Street property because, at the time the liens were placed on the property, D.H. Mitchell and his wife (now Mrs. Hinton) owned another piece of property on Pacific Avenue upon which they resided and that this property was the homestead of D.H. Mitchell and his wife, not the Catherine Street property.[87]  On appeal, the Court of Civil Appeals held that the lower court did not err in finding that the evidence conclusively showed that the Pacific Avenue

---

[84] *See, e.g., id.*; *see also Carstens v. Landrum*, 17 S.W.2d 803, 804–05 (Tex. 1929).

[85] *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733, 734 (Tex. Civ. App.—1934, writ ref'd).

[86] *Id.*

[87] *Id.*

property was the homestead of Mr. and Mrs. Mitchell at the time the improvement liens accrued and that such issue was properly ruled upon by the lower court without submission to the jury. Specifically, the Court of Civil Appeals noted that the undisputed evidence showed: (1) D. H. Mitchell and his wife acquired title to the Catherine street property about 1921 or 1922, resided thereon and made it their homestead until about three or four years before the street improvements were made, when they moved to and resided upon another place they owned on Pacific Avenue; (2) the Catherine Street property, after being vacated, was rented and occupied by tenants; (3) shortly after moving from the Catherine Street place, Mr. and Mrs. Mitchell placed a loan of $1,000 thereon; and that (4) Mrs. Mitchell continued to occupy the Pacific Avenue place for about a year after the death of Mr. Mitchell, and was residing there at the time of her marriage to Mr. Hinton.[88]  On appeal, Mrs. Hinton specifically argued that her testimony that "she and her former husband claimed the Catherine [S]treet place as their homestead; that they never claimed the other place as their homestead, nor did they intend to permanently reside there, but intended to return to their old home place" as well as the testimony of Mr. McGinty, chairman of the city commission of Terrell, that "while the paving enterprise was in progress, both Mr. and Mrs. Mitchell stated to witness[es] that they claimed the Catherine [S]treet place as their homestead" was enough evidence to send the homestead issue to the jury.[89]  However, the Court of Civil Appeals found the record barren of any fact supporting such claim[90] and

---

[88] *Id.* at 735.

[89] *Id.* at 735-36.

[90] The Court of Civil Appeals also noted that "if, however, it be assumed that they did not intend to abandon the Catherine street property as a homestead, the continuity of this intention was certainly broken when they mortgaged the property to secure a loan of $1000, for it will not be assumed that they would be parties to the void, illegal, and futile act of mortgaging their homestead."  *Id.* at 736.

26

ultimately held that the Mitchells "removal from the Catherine [S]treet place to the Pacific [A]venue place, and its occupancy and use as a homestead, unaccompanied by any act evidencing an intention to return to the former home, silently, but effectively, proclaimed it to be their homestead, and constituted the highest and most conclusive evidence of the abandonment of the Catherine [S]treet property as a homestead."[91]

Here, the evidence before the court regarding the Comus use of the Paladium Property and Home # 2 demonstrates the following: (1) the Comus resided at the Paladium Property for several years before and on the bankruptcy petition date and claimed it as their homestead; (2) the Comus discontinued using the Paladium Property as a residence during the bankruptcy case—in fact, soon after the Chapter 7 Trustee's and judgment creditors' Adversary Proceeding was filed (in the Fall of 2010)—and began renting it for income, directing the rental payments to be made to an entity that this court has earlier determined to be the alter ego of Mr. Comu; (3) the Comus have continuously, for the past five years, while renting out the Paladium Property, resided in another residence, Home # 2, that was purchased for cash in the Fall of 2010 by a company created and controlled by Mr. Comu, Continental Partnership; (4) while residing at Home # 2, the Comus have paid no rent for the majority of the time they have used Home # 2 as their residence (since 2011); (5) the Comus have made some improvements to Home # 2, including adding lighting and conversion of an attic to a master closet; (6) the Comus (mostly through Mr. Comu) have had several discussions with the Prices (mostly through Mr. Price) regarding the Comus' desire to sell the Paladium Property over the last year; and (7) ***other than the purely self-serving statements made by the Comus that they intend to move back to the***

---

[91] *Id.* at 736.

*Paladium Property (made the day before the trial on this issue and during trial), there was no evidence of any specific acts actually demonstrating such intent*. Even if self-serving statements of intent are sometimes enough, the court does not find them credible here. On balance, the court finds that the totality of the evidence demonstrates that "beyond almost the shadow, at least [of] all reasonable ground of dispute," that there has been an effective abandonment of the Paladium Property as the Comu's exempted homestead with a true intention not to return and claim such exemption. While the Comus have made statements (similar to the statements made by the homestead claimant in *Hinton*) that they intend to return to the Paladium Property, this court, similar to the Court of Civil Appeals in *Hinton,* finds little in the way of actual facts or actions supporting such statements.[92] In summation, the Trustee and the Katz Parties are entitled to now look to the Paladium Property to satisfy the Adversary Judgment.[93] It has been abandoned as the Comu's homestead.

Accordingly, it is

---

[92] The Comus have argued that this court should give deference to the Comus' subjective intent to claim the Paladium Property as their homestead. However, subjective intent only becomes important in a "dual residence scenario" when there is *an ambiguity* regarding which of two properties owned by a claimant *is being utilized* as claimant's homestead. *See In re Tinsley*, No. 09–36036, 2010 WL 4823208, at *6-8 (Bankr. N.D. Tex. Nov. 16, 2010). The court does not believe there to be an ambiguity with regard to which residence is being utilized as the Comus' homestead, as they are residing only at Home # 2, not the Paladium Property. *Id.*

[93] The court acknowledges the existence of both article 16, § 50(b) of the Texas Constitution, which provides that "an owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law," and section 41.004 of the Texas Property Code, which provides that "if a homestead claimant is married, a homestead cannot be abandoned without the consent of the claimant's spouse." While Mrs. Comu has argued that she has not consented to the abandonment of the homestead exemption in the Paladium Property under both of these provisions, the court believes that there was *no credible evidence showing a lack of consent*. By way of example, there was no credible evidence that Mrs. Comu continued to reside at the Paladium Property, even after the purchase of Home # 2, or that she perhaps told Mr. Comu that she did not want to leave the Paladium Property and move into Home # 2. *See, e.g., Cervera v. First State Bank, Mesquite (In re Cervera)*, Adv. No. 05-03103, 2006 WL 6508276, at * 5 (Bankr. N.D Tex. Jan. 18, 2006) (unpublished) (court found a lack of consent to abandon where wife had continued to reside on property after couple had separated and husband had left property and attempted to designate a new property as the martial homestead).

**ORDERED** that Mr. Comu shall turnover to the Trustee and the Katz Parties the Paladium Property, with all documents and records related to the Paladium Property, including title thereto, within ten (10) calendar days so that the Paladium Property may be sold and the proceeds delivered to the Trustee c/o David Elmquist, Reed & Elmquist, P.C., 501 N. College St., Waxahachie, Texas 75165.

**### END OF MEMORANDUM OPINION AND ORDER ###**